UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMY CONWAY,

      Plaintiff,

vs.

KAZ INCORPORATED, a Foreign
Corporation,

      Defendant.

Case No. 2:09-CV-10065
HONORABLE MARIANNE O. BATTANI
MAGISTRATE MONA K. MAJZOUB

---

RILEY P. RICHARD (P 23822)
Attorney for Plaintiff
39040 W. Seven Mile Road
Livonia, MI  48152-1006
734-542-9500
Fax:  734-542-0057

McLEOD & ASSOCIATES
FREDERICK G. ECCLESTONE (P 26313)
Attorneys for Defendant
Two Towne Square, Suite 550
Southfield, MI 48076-3766
(248) 386-8800
Fax:  (248) 386-8842

---

## MOTION FOR SUMMARY JUDGMENT

NOW COMES the Defendant, KAZ, INCORPORATED, by and through its Attorneys, McLEOD & ASSOCIATES, and, for its Motion for Summary Judgment pursuant to FR Civ P 12(b)(6) and FR Civ P 56(c), states as follows:

1.  This litigation arises out of a product liability claim wherein Plaintiff alleges that she sustained third-degree burns as a result of a heating pad that was manufactured by Defendant.  A copy of the Plaintiff's Complaint is attached hereto and labeled as Exhibit A.

2.  Attached hereto, made a part hereof, and incorporated by herein reference are the following additional materials in support of the factual basis for this Motion:

> ➢ Sworn deposition testimony of Plaintiff Amy Conway.  (Exhibit B);

 &#10095; Sworn deposition testimony of Plaintiff's mother Bonnie Conway .(Exhibit C);

 &#10095; Sworn Deposition testimony of Plaintiff's family physician, Dr. Bruce Troutman, D.O. (Exhibit D);

 &#10095; Subpoenaed medical records of Diplomat Pharmacy (Exhibit E);

 &#10095; Subpoenaed medical records of Swartz Ambulance Service (Exhibit F);

 &#10095; Subpoenaed medical records of Hurley Hospital (Exhibit G);

 &#10095; Subpoenaed medical records of Dr. Bruce Troutman (Exhibit H).

3. This Motion is further supported by the attached sworn Affidavit of Eugene Schoener, PhD, including the incorporation, by reference, of his Curriculum Vitae (Exhibit 1), and expert opinion report (Exhibit 2).

4. Plaintiff has failed to state a claim upon which relief can be granted and/or there is no genuine issue as to any material fact, and, therefore, the Defendant is entitled to a judgment as a matter of law for the reason that Ms. Conway had an impaired ability to function on the date of her occurrence that was directly caused by, and due to, the influence of controlled substances, and that as a result of her impaired ability to function, Ms. Conway was 50% or more the cause of the events that resulted in her burn injuries on the date of the alleged incident.  See MCLA 600.2955a(1).

5. It is further the position of the petitioning Defendant that the Plaintiff's action is frivolous and violated FR Civ P 11, because the Plaintiff's claims are unwarranted under existing law.  There is no question that the Plaintiff knew she was in a drug induced coma at the time of her injuries when she filed her Complaint, and her attorney knew, or should have known, this as well.

2

WHEREFORE, Defendant, KAZ INCORPORATED, respectfully requests that this Honorable Court Grant Defendant's Motion for Summary Judgment as well as award reasonable costs and attorney fees so wrongfully sustained.

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF THE DEFENDANT KAZ INCORPORATED

### STATEMENT OF FACTS

**Complaint (Exhibit A)**

Plaintiff Amy Conway is alleging third degree burns to her lower back as the result of her use of a heating pad allegedly manufactured, designed and tested by Defendant Kaz, Inc. Plaintiff's theories focus on an alleged breach of implied warranty of fitness for anticipated, or reasonably foreseen, use.

**Deposition Testimony of Amy Conway (Exhibit B)**

Plaintiff admitted to be under significant anxiety stressors when she retired the evening before her injuries.  These stressors included her concern regarding a possible job loss due to uncertainty associated with the announced bankruptcy cause at her employer, Northwest Airlines.  Her concern was sufficient enough for her to seek a prescription for the anti-anxiety drug, Klonopin, only two (2) days before her incident (pp. 110-111).  She was engaged in a pending domestic relations action, with her "ex" (p.111).  She had just been in an argument with her boyfriend because she had wrecked his car (p.107, 111).  She had suffered "terrible," "break-through pain" associated with her chronic back problems, just the day before (p 111-112).

She retired at approximately midnight (p.79).  She admitted that she did not recall the ambulance ride to the hospital on the morning of her injuries.  The first thing she remembered

3

after the incident was when she woke up in the ICU unit of Hurley Hospital, 2 days after the

occurrence (p 24-25).

Her prescription From Dr. Troutman called for only 2 Fentanyl patches (p.78).  When

questioned about her prescribed medication, Plaintiff had only a vague understanding and

recollection of use, dosage, strength, and drug warnings.  See the following testimony:

Page 67:

> Q: Did you have any understanding with regard to the Duragesic pain patch that you were prescribed in 2003 that it should not be used in dosages greater than once every three days?
> ***A: Yes.***
> Q: And did you have any understanding as to what would happen if you did use it more than once every three days back then?
> A: Not – I wasn't sure exactly what would happen, no.  I just knew you had to change it every three days.

Page 68:

> Q: Do you remember whether on the box or the pill cases of these medications, the morphine or hydroquinone or Duragesic, whether there were warnings on the box or the pill case with respect to usage of those narcotics?
> ***A: I can remember, like, makes you drowsy, do not operate machinery. That's about it as far as warnings on the bottles.***
> Q: Okay.  On all of them?
> ***A: I believe so.  I'm not for sure***.

Page 72:

> Q: Okay.  And we asked – I asked you about this before with regard to the Duragesic pain patch.  I'm asking you the same question as to Fentanyl; do you recall the warnings that were accompanying that patch when it was prescribed to you?
> ***A: I don't recall, no***.

Page 92:

> Q: How many – when did you last take a Fentanyl patch prior to going to bed that evening?
> ***A: I was prescribed at that time – two Fentanyl patches, two 75 milligrams and I think I had a new patch on the day before, or it could have been that day***.

4

Q: Okay.  I just want to make sure I understand that.  As you sit here today, do you recall taking any other medications on the 15th or 16th other than the Fentanyl patches that you took on the 15th?

**A: *I don't recall if I did*.**

**Q: *I'm asking you to distinguish that.  Are you saying you did not or that you simply don't recall whether you did?***

**A: *I'm saying I don't recall*.**

Page 110:

Q: Okay.  And it says states took extra Klonopin, .5, five or more throughout the day.

A: Okay.

Q: Do you recall –

**A: *I don't recall*.**

Q: -- taking extra medication such as that?

**A: *That was prescribed to me, so I may have taken it, but I don't remember, not at all*.**

Q: Klonopin is what, the narcotics again?

A: No.  Klonopin is not a narcotic.  It's anti-anxiety.

**Q: *Okay.  Would a normal dosage be five times a day for Klonopin, to your recollection, for this anxiety?***

**A: *I don't recall*.**

Plaintiff's own deposition testimony also substantiates her utter failure to read any of the provided warnings associated with the subject heating pad.  This led directly to her misuse of the product.  Specifically, Plaintiff testified:

Pages 101-102

Q: On the occasions where you would have purchased the heating pads on your own – you indicated that this was sort of an annual event – did they typically come with warnings on the packaging or on the pad, if you know?

**A: *I don't know*.**

Q: Okay.

**A: *I never found the need to reach the whole thing because I used them safely for so many years without any incident*.**

Q: Were you aware that heating pads in general come with warnings or danger warnings?

A: I don't – I'm – I think everything does, so I'm not sure.

5

*Q: Okay. I'm asking you – you say everything, and that's fine, but I'm asking you specifically about pads. Were you aware that heating pads come with warnings or danger warnings?*

*A: No.*

Q: Ma'am, on the occasions where you have used heating pads before November 16, 2006, *did you ever fall asleep with them on before*?

*A: Yes.*

Q: How many occasions?

A: I don't recall how many.

Q: Were you aware of the fact that heating pad manufacturers warn against the use of a pad that has been folded over prior to your use on November 16, 2006?

A: No.

*Q: Were you aware of the fact that heating pad manufacturers warned about not putting these pads underneath your body, but rather, laying them on top of your body during use?*

*A: No.*

*Q: Were you aware of the fact that heating pad manufacturers warned in general about not sleeping on – while using these pads?*

*A: No, I wasn't.*

<u>Pages 117 -118:</u>

Q: Showing you what's been marked as Exhibit 3, you would agree with me that this warning as it existed on the covering, which is our Exhibit 7, in fact has a big warning at the top that says danger. Do you see that?

*A: Yes.*

Q: So you would agree with me that that warning danger was there to be seen had you read the instructions, correct?

*A: I assume so. Who thinks of a heating pad as dangerous?*

Q: I'm just asking you whether it was there to be seen, ma'am.

*A: It's there to be seen, yes.*

*Q: Okay. And also the next line, it says burns will result from improper use of this heating pad. Do you see that?*

*A: Uh-huh – yes.*

*Q: Okay. And that warning was there to be seen had you taken the time to read that warning is that correct?*

*A: That's correct.*

*Q: And it also goes on to say that if you don't use it in conformity with these instructions, there is a risk of burns, is that correct?*

*A: Yes.*

*Q: This also says do not use while sleeping, correct?*

*A: That's correct.*

6

> *Q:  So that warning was there to be seen had to read it, true?*
> *A:  That's true.*
> Q:  Did you place this pad underneath you when you went to bed?
> A:  When I laid on it, was I laying on top of it?
> Q:  Yes.
> A:  Sometimes I did, yes.
> Q:  I'm asking you not sometimes.  *I'm asking you on the night of the*
> *occurrence, did you have this underneath you.*  That's where your
> burns were.
> *A:  Yeah.  I guess I did, then, yes.*

**Deposition Testimony of Bonnie Conway (Exhibit C):**

The Plaintiff's mother, Bonnie Conway, confirmed her daughter told her that she had been in a fight with her boyfriend over damage to his car.  Amy was so upset, had cried (p. 24-25).  After talking with Amy, Mrs. Conway retired about 11:00 PM.  She could not recall when Amy went to bed (p. 25).  The next morning at around, 10:00 AM, she found her daughter non-responsive to verbal communications and shaking.  She was unable to wake Amy.  She described her daughter's breathing as "shallow" and it seemed like she was "gasping" (pp. 31-12, pp. 26-27).  Amy felt "clammy" (p.28).  She called 911 (p.28).  The subject 3rd degree burn was not discovered until Amy was turned over by treating physicians in the ICU (p. 37, p.43).  She went home the evening of the admission at 10:00 PM at the request of Hurley's staff, and with out having spoken to her daughter.  She described having her daughter on life-support as "horrific - it was a nightmare" (p.36)

**Deposition Testimony of Dr. Troutman (Exhibit D):**

Dr. Bruce Troutman has been the Plaintiff's primary personal physician since 2001(p. 10).  His medical records are attached hereto, and labeled as Exhibit H.  They will be discussed in detail later in this Brief, as being historically important.

Dr. Troutman's sworn deposition testimony is extremely adverse to the Plaintiff for a number of reasons:

First, he confirmed that Amy Conway had historically sustained a 2nd degree burn injury to her back as a result falling asleep on a heating pad on November 29, 2005.  (NOTE: This is approximately one year before the incident which is the subject of this litigation.)  At that time of her burn on November 29, 2005, she was taking a Duragesic (Fentanyl), and Vicodin.  He specifically warned her to stop using the heating pad, or put it on a timer.  His testimony was as follows with respect to that appointment:

Page 25:

**Q. And you saw that her back had sustained second-degree burns; is that correct?**

**A. Yes.**

**Q. And the location that this came from, a heating pad came from her?**

**A. Yes.**

Page 26:

**Q. Okay.  And it says here, quote, you told her "quote, quit using the heating pad directly, or put it on a timer, period, unquote; is that correct, Sir?**

**A. Yes.**

**Q. You told her that?**

**A. Yes**

**Q. Why did you tell her not to use the heating pad directly?**

**A. Because it can cause bad burns.**

**Q. Okay.  And why did you tell her to use a heating pad that was on a timer?**

**A. So it would turn off automatically after a certain period of time.**

**Q. And did you tell her that?**

**A. Yes.**

8

This Court is referred to Amy Conway's office visit with Dr. Troutman <u>during the day, in advance of the evening of the subject incident</u>.  Troutman deposition Exhibit 3 -- his clinical notes for that date -- read as follows:

> **11-16-2006**
> **Problem # 1   Back Pain**
> **S:   Patient in today tremoring, she can't sit still, she is pleading for a pain shot, doesn't want to wait until she gets to the pharmacy to get the medication, states she is out...**
> **O:  Patient in some distress, shaking**
> **A:   1) Multiple herniated discs**
> **P:   Refilled the medications, however, got a call from the pharmacy stating that she got the last refill on the 25th of last month that makes her 10 days early for these medications, claims I authorized an early refill and I did not. The pharmacy is noting she has been earlier on each prescription.  Going to run MAPS**.

Dr. Troutman described Ms. Conway's tremors as being consistent with either drug withdrawal, or extreme pain (p. 30).  He identified the "MAPS" system as a service run by the state that allows one to check on a patient's prescription drug use demographically to determine what other physicians might be authorizing other prescriptive drugs.  He did this because of his own concerns, and because of the concern expressed by the pharmacist that Ms. Conway might be abusing her medications.  (p. 30-31)

Of paramount importance to this Court should be that Dr. Troutman testified that he had frank discussions with Amy Conway on <u>December 21, 2006, during his first office visit with her after the hospitalization for the subject burns sustained in mid-November, 2006.</u>  Reference was made to the following note in his medical chart on that date that read in pertinent part as follows:

> **She was dishonest and she consequently overdosed on Klonopin tablets and opiates fell asleep on a heating pad**.  (See Exhibit 4 of the Troutman deposition transcript.)

It was his opinion that the Plaintiff had been dishonest with him (pp. 33-34).  His sworn testimony explaining those clinical notes was a follows:

Page 35:

> Q.    Alright, this statement she, quote, was dishonest, unquote, that's your opinion?
>
> A.    Yes.

Dr. Troutman then proceeded confirm <u>an admission against interest that had been provided to him directly from Amy Conway:</u>

Page 36:

> Q.    ...Just so I'm clear, <u>the statement, quote, she consequently overdosed on Klonopin tablets and opiates, fell asleep on a heating pad, unquote—</u>
>
> A.    <u>I would have gotten that from her</u>.

Again, on Page 37:

> Q.    <u>I'm asking you a very simple statement here.  Your chart says, quote, consequently overdosed on Klonopin tablets and opiates, comma, fell asleep on a heating pad, period, and unquote.  Did that statement come from Ms. Conway?</u>
>
> A.    <u>Yes</u>.

Also on Page 50:

> Q.    <u>You would agree with me that her statement to you that she admittedly overdosed would be an admission that she took more pain medication that you prescribed?</u>
>
> A.    <u>At that time.</u>
>
> Q.    <u>That's what I'm saying, but at the time of that admission to you she admitted to you that she took more medication that had been prescribed, correct, and overdosed?</u>
>
> A.    <u>At that time</u>.

This party admission, pursuant to FRE 801(d)(2)(A), is quite simply fatal to the Plaintiff's case.

10

Dr. Troutman was also of the opinion that Ms. Conway must have been impaired from her medication, given the burns she suffered and the fact that she did not wake up.

Page 40:

> **Q.**  You saw the wounds on Ms. Conway's back, did you not sir?
> **A.**  I did.
> **Q.**  **…would you expect a person suffering those types of burns to be awakened if they were not impaired functionally?**
> **A.**  **I would expect a person to respond**.

Pages 40-41:

> **Q.**  …Ms. Conway is indicating in this lawsuit that she fell asleep on a heating pad.  I want you to assume as well that she found her unresponsive on the morning of the 17th…and that she suffered from the burns that you observed subsequently.  **Would she have to have been impaired in some fashion not to have felt the burning effect on her back which caused those injuries?**
> **A.**  **There was some kind of impairment, yes.**
> **Q.**  **You would expect a patient that suffered a burn like that to be awakened if she wasn't impaired would you not?**
> **A.**  **Yes, I would**.

**Subpoenaed Medical Records of Diplomat Pharmacy (Exhibit E)**

The records from this facility confirm that a prescription for 60 Fentanyl 75 MCG/HR patches was filled on October 25, 2006.  The records also confirm that a prescription for 120 Clonazepam .5 MG tablets were filled on November 16, 2005 – the day of the evening immediately prior to the alleged incident.

**Subpoenaed Medical Records of Swartz Ambulance (Exhibit F)**

These records confirm that Swartz received a call @ 9:43 AM on November 17th and arrived on scene at 9:49 AM in response to a dispatch regarding a **"possible overdose."**  The paramedic records continue records continue that on arrival they…

> **…found a 34 y/o female patient last seen at midnight last night.  Pt. is a known heroin user and has overdosed before…Pts lung sounds are very**

11

**congested and labored.  pt has a history of 3 hern disk and depression.  Was placed on O2 via mask…**

The ambulance crew left Bonnie Conway's home at 10:03 AM and arrive at Hurley Hospital at 10:06 AM.

**Subpoenaed Medical Records of Hurley Hospital (Exhibit G):**

The records from this facility are voluminous.  The records relevant to this Motion are summarized below:

The ER summary from November 17, 2006 reads, in pertinent part, as follows:

**Date:  11/17/2006**
**Chief Complaint**
**Respiratory Difficulty**

**History of present illness**
**The patient is a 34-year-old female who presents today in respiratory distress.  She is found by her mother with snoring respirations.  She was unable to arouse her.  With her sonorous respirations, EMS found her to be tachypneic in the 50's, with SAT decreased into the 60's to 70's.  They were concerned about possible overdose, as this patient had a history of narcotic overdose in the distant past.  The treated her with 1 MG of Narcan IV and supported her with oxygen and nebulizer on route to the hospital.**

**The patient had a fight with her boyfriend last night.  Her mother reported that she was very distraught at the time…She does have a history of herniated disk in her lumbar spine.  For this she receives three Fentanyl patches, as ell as P.R.N. Klonopin and P.R.N. Vicodin Es…**

**Physical examination**
**…This is a very toxic looking female in severe respiratory distress.  She is very tachypneic.  She is not able to speak and is not carrying out purposeful movements at this time**.

A November 17, 2006 Consultation Sheet prepared by Dr. Farhan noted that Conway was found unresponsive in her bedroom by her mother.  She was in respiratory distress and

12

unresponsive to the Narcan that was initially administered.  Dr. Farhan notes **"Pt. found with**

**three Fentanyl patches applied to her lower back."**

A Behavioral Medicine Department Consultation Report dated November 20, 2006,

states that Plaintiff advised the hospital that she had taken "**extra Klonopin (5 or more)**

**throughout the day"** prior to this incident.  The record continues that Conway

> *reported had pain patch filled, placed 2 new patches on – acknowledges she may have kept 4 old patches on – didn't feel like they were working.  Routinely sleeps with heating pad (HX of burns to back)…Reports anxiety with intermittent depressive episodes, frequent crying spells related to multiple stressors….Acknowledges mood and pain impact on her life.  Receptive to psychiatric intervention*.

Finally, the Hurley Hospital Discharge Summary dated 12/15/06 provides in pertinent

part as follows:

> **Discharge Diagnoses**
> 1. **Drug Overdose with respiratory distress**
> 2. Third-degree burn of the lower back
> 3. Chronic Diskogenic back pain
> 4. **Depression**.

## Subpoenaed Medical Records of Dr. Troutman (Exhibit H):

The medical records of Dr. Troutman show a long history of addictive, drug-seeking

behavior by Ms. Conway.  See the following specifics in his chart.

08/29/03        Conway admitted to "**eating Vicodin**".

09/15/03        Dr. Troutman noted that Conway was "**using a lot of pain medications**".

09/25/03        Dr. Troutman noted that Conway was taking **2-3 pain meds every 8 hours**.

10/13/03        Conway admitted to **taking more medicine than prescribed due to her back pain**.

10/27/03  *The doctor talked to Conway about her medications, but was unable to get a decisive answer from Conway regarding the amount of medication she was taking.  He concluded that she was taking between 60-240 mg of Morphine/day.*

04/16/04  Conway was *a week early to obtain more Duragesic patches.*  Conway claimed that the patches were "falling off".

03/28/05  Dr. Troutman *retracted the use of Vicodin due to Conway's over use of the drug*.

06/28/05  Conway complained that she was "*not getting enough refills on her Vicodin*".  *The doctor noted that Conway's Vicodin tablets needed to be more closely monitored.*

*11/29/05*  *Conway presented with a burn on her back from a heating pad.  She was diagnosed with a back burn.  She was told to quit using the heating pad or to put it on a timer.  Her medications were refilled.*

02/07/06  Conway indicated that the Lidoderm patches were *helping, but she was concerned about the discoloration caused by the burning.  She was noted to have alligator type appearance on the back.*

06/20/06  *It was noted that Conway was using two 75 mg Duragesic patches and Vicodin ES for breakthrough pain.*

07/17/06  *Conway criticized her other doctors for accusing her of abusing her medication because she was three patches short on her Duragesic.*  The Emergency Room gave her Vicodin, *but they would not provide Duragesic patches*.

11/16/06  *During this visit, Conway was pleading for a pain shot.  She was noted to be suffering from tremors.  Dr. Troutman refilled her prescriptions, but he received a telephone call from the pharmacy indicating that the prescriptions were being refilled 10 days too early.  She told the pharmacist that Dr. Troutman authorized an early refill, which he denied.  A MAPS was requested on Conway.*

**12/21/06**  Plaintiff admits had been in rehab on two separate occasions and that she was an "*addict*".  He concluded that Plaintiff had *overdosed* on Klonopin tablets and opiates and fell asleep on a heating pad, resulting in a burn to her back.  Dr. Troutman diagnosed Plaintiff with an *addictive personality* and 3rd degree burns to her lumbosacral area.

**Affidavit of Dr. Eugene Schoener, PhD (Exhibit F)**

Dr. Eugene Schoener is an expert in the field of Pharmacology and Toxicology.

Following extensive review of the records, deposition transcripts and pleadings, Dr. Eugene

Schoener prepared his expert report of September 26, 2009.  His findings include, but are not

limited to, the following:

> - Prior to the subject incident Conway exhibited a pattern of drug-seeking behavior and dose escalation of her opiate medication.
> - The third-degree burn that Conway sustained to her lower back on November 17-18, 2006, was a result of a drug-induced coma, which was caused by Conway's own actions.
> - Based upon the records, Conway took five Klonopin tablets, in addition to her usual dose of Vicodin ES and three Duragesic patches on the date of the incident.
> - Based upon the amount of drugs in Conway's system, she did not wake up when the heating pad began to burn her because she was in a drug-induced coma; the opiates suppressed her pain perception and the Klonopin kept her asleep.
> - While there is no evidence that the heating pad came into contact with the Duragesic patches, the Duragesic patches contain a clear warning on the package inserts that heat can increase the risk of uptake, resulting in severe toxic consequences.

Ultimately, it is Dr. Schoener's opinion that the combination of above-described

controlled substances in Ms. Conway's system is consistent with, and explains, why she did not

experience pain, and why she did not awaken even after suffering the injury.  He concludes that

Ms. Conway's burn injury occurred as a direct result of her impairment (inability to feel pain,

awaken, understand the danger, remove the heating pad and otherwise respond appropriately)

and that this impairment was directly caused by her inordinate use of controlled opiate and

benzodiazepine drugs.  He concludes that Ms. Conway had an impaired ability to function on the

date of her occurrence that was directly caused by, and due to, the influence of controlled

substances, and that as a result of her impaired ability to function, **Ms. Conway was 50% or**

**more the cause of the events that resulted in her burn injuries on the date of the alleged**

**incident.**

## STANDARD OF REVIEW

### I.  Federal Rule of Civil Procedure 12(b)(6)

FR Civ P 12(b)(6) and FR Civ P 56(c) provide for summary judgment when the opposing

party has failed to state a claim upon which relief can be granted and/or there is no genuine issue

of material fact.  Under Rule 12(b)(6), a complaint may be dismissed only if it appears "beyond

doubt that the plaintiff can prove no set of facts in support of his [or her] claim that would entitle

him [or her] to relief."  *Conley v. Gibson*, U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).  The

complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts

must be accepted as true.  *Morgan v Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

However, the Court need not accept as true legal conclusions or unwarranted factual inferences.

*Lewis v ACB Business Serv., Inc.,* 135 F.3d 389, 405 (6th Cir. 1998)

### II.     Federal Rule of Civil Procedure 56(c)

FR Civ P 56(c) provides that summary judgment is proper if the pleadings, depositions,

answers to interrogatories and admissions on the file, together with affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law.  *City Management Corp. v U.S. Chemical Co.,* 43 F.3d 244, 250 (6th Cir.

1994).  A party seeking summary judgment bears the burden of specifying the basis upon which

it contends judgment should be granted and identifying that portion of the record that

demonstrates the absence of a genuine issue of material fact.  *Pierce v Commonwealth Life Inc.*

*Co.*, 40 F.3d 796, 800 (6th Cir. 1994)(citing *Celotex Corp. v Catrett*, 477 U.S. 317, 322, 106 S.Ct.

16

2548, 91 L.Ed.2d 265 (1986)).  Under this test, the moving party may discharge its burden by "pointing out to the district court… that there is an absence of evidence to support the non-moving party's case." *Hall v Tollett*, 123 F.3d 418, 422 (6th Cir.1997)(quoting *Celotex,* at 325)). Thereafter, it is the non-moving parties' responsibility to come forward with facts supported by evidence, upon which a reasonable jury could find there to be a genuine fact issue for trial.  Mere conclusory assertions or speculation will not suffice to avoid summary judgment.  *Moore v Philip Morris, Cos.*, 8 F.3d 335, 343 (6th Cir.1993).  The non-moving party must go beyond the pleadings and provide sufficient evidence to establish the dispute.  *Matsushita Elec. Indus. Co. v Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing Fed.R.Civ.Pro. 56(e)).

III.    **Michigan Law Applies**

In diversity cases, federal courts are bound by the law as declared by the highest state court. *Reid v Volkswagen of America, Inc.,* 575 F.2d 1175, 1176 (6th Cir.1978) (per curiam) (citing *Erie R.R. v Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).  Because this is a diversity action, Michigan substantive law applies.  *Reid,* 575 F.2d, at 1176.

IV.     **Impairment from a Controlled Substances Provides an Absolute Defense to the Plaintiff's Complaint**

MCL 600.29255a provides in pertinent part as follows:

(1) It is an absolute defense in an action for the death of an individual or for an injury to a person or property that the individual upon whose death or injury the action is based had an impaired ability to function due to the influence of intoxicating liquor or a controlled substance, and as a result of that impaired ability, the individual was 50% or more the cause of the accident or event that resulted in the death or injury…

17

(2) As used in this section:

(a) "Controlled substance" means that term as defined in section 7104 of the public health code, Act No. 368 of the Public Acts of 1978, being section 333, 7104 of the Michigan Compiled Laws.

(b) "Impaired ability to function due to the influence of intoxicating liquor or controlled substance" means that, as a result of an individual drinking, ingesting, smoking, or otherwise consuming intoxicating liquor or a controlled substance, the individual's senses are impaired to the point that the ability to react is diminished from what it would be had the individual not consumed liquor or the controlled substance…

## <u>ARGUMENT</u>

### DEFENDANT IS ENTITLED TO SUMMARY DISPOSITION WHERE PLAINTIFF WAS MORE THAN 50% AT FAULT FOR THE SUBJECT INCIDENT AND HER ALLEGED INJURIES.

Based on sworn deposition testimony of Plaintiff Amy Conway, her mother, Bonnie Conway, and the Plaintiff's primary care physician Dr. Troutman, together with a review of Plaintiff's subpoenaed historical and treatment medical records, there is no question of any material fact that the Plaintiff's injuries were the result of her own negligence. Specifically, in response to many life stressors, Plaintiff knowingly abused prescribed medications on the night of the subject incident, causing her to go into a drug-induced coma that impaired her ability to react to any painful stimuli. As a direct and proximate result of this impairment -- together with her failure to read the heating pad warnings, and resultant misuse of heating pad when she laid on top of the pad -- she sustained her injuries. This is the exact same scenario that had taken place previously, almost one year to the day. She was warned then against taking her prescription medications, and then sleeping on a heating pad, by Dr. Troutman -- or told, alternatively, to purchase a heating pad with a timer. She ignored those warnings, as well.

18

## CONCLUSION

There can be no doubt, based on this record, that Plaintiff's addiction to, and over use of, prescription medication -- to the point of coma, was the cause of the subject burn.  Common sense begs the irrefutable conclusion that Ms. Conway could not have sustained severe 3rd degree burns over a large portion of their body -- and not even know, or sense it was happening -- unless her senses were completely and totally impaired.  Moreover, both Ms. Conway's primary physician, Dr. Bruce Troutman, D.O. (in his sworn deposition testimony), and Defendant's expert Dr. Eugene Schoener, PhD (by sworn Affidavit), have confirmed that the prescription drug impairment as the cause in of Ms. Conway's injuries.  Had Plaintiff avoided taking excessive amounts of prescription medication, heeded the warnings on her medication, heeded the warnings on the heating pad, or heeded the warnings of Dr. Troutman -- she would never have been injured.  Defendant maintains that the Plaintiff was **solely the author of her own misfortune.**  There is no question of material fact that Plaintiff's impairment was more than 50% the cause for her injuries and, as such, Summary Judgment is warranted.

WHEREFORE, Defendant, KAZ INCORPORATED, respectfully requests that this Honorable Court grant their Motion for Summary Judgment, and award Defendant costs and attorney fees, so wrongfully incurred by the filing of this frivolous action.

s/FREDERICK G. ECCLESTONE
McLEOD & ASSOCIATES
Two Towne Square, Suite 550
Southfield, MI  48076-3766
Phone:  (248) 386-8800
E-mail:  frederick.ecclestone@aig.com
(P 26313)
Attorneys for Defendant

Dated:  November 11, 2009

19

# **CERTIFICATE OF SERVICE**

I hereby certify that on <u>November 11, 2009</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>Riley P. Richard, Esq.,</u> and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:  <u>(NONE)</u>.

s/FREDERICK G. ECCLESTONE
McLEOD & ASSOCIATES
Two Towne Square, Suite 550
Southfield, MI  48076-3766
Phone:  (248) 386-8800
E-mail:  frederick.ecclestone@aig.com
(P 26313)
Attorneys for Defendant